United States Court of Appeals,

Fifth Circuit.

No. 91-4477.

Felix Gonzalez GISBERT, et al., Petitioners-Appellants,

v.

U.S. ATTORNEY GENERAL, Respondent-Appellee.

April 28, 1993.

APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF LOUISIANA.

Before GARWOOD, and EMILIO GARZA, Circuit Judges.[*]

Circuit Judge:

Petitioners-appellants[1] (petitioners or aliens) are Cuban nationals who have been ordered excluded from the United States and, following revocation of their immigration parole, are detained in custody of the Immigration and Naturalization Service (INS) pending their return to Cuba. The aliens filed petitions for habeas corpus alleging that their detention violates their due process rights, is an abuse of discretion by the Attorney General, and violates international law. The district court consolidated and dismissed the petitions.[2] Petitioners appealed this ruling, raising the same issues before this Court. We affirm.

**Facts and Proceedings Below**

The facts concerning petitioners are similar and undisputed. Petitioners are Cuban nationals who arrived in the United States in 1980 during the Mariel boatlift[3] in which approximately 125,000

---

[*]Judge John R. Brown was on the panel that heard oral argument in this case, but passed away before the decision was entered, and the case is accordingly decided by a quorum.

[1]Petitioners are Felix Gonzales Gisbert, Alberto Quintero, Alberto Garcia, Carlos Ocaña, Jose Luis Perez, Sixto C. Asevedo, Ricardo Sanchez-Patterson, Reina Cecilia Martinez, Jesus Crespo Carbonell, Roberto Castellon, Jose Luis Arguez-Perez, and Miguel Martinez-Diaz.

[2]The opinion of the district court is published as *Ramos v. Thornburgh,* 761 F.Supp. 1258 (W.D.La.1991).

[3]The Cubans who arrived in the boatlift are known as Mariel Cubans because they departed from the Mariel Harbor in Cuba.

Cubans came to the United States. Officials from the INS detained the aliens at the border and later made a decision to exclude them from the United States. The validity of this exclusion is not challenged. The United States has been unable to return petitioners to Cuba, however, because Cuba has thus far refused to accept them back.[4] No other country has expressed a willingness to accept the Mariel Cubans.

Following their initial detention, petitioners were granted immigration parole into the United States by the INS. While on immigration parole, each of the petitioners was convicted of, and sentenced for, violations of state or federal law ranging from attempted murder to trafficking in cocaine to petty theft. After petitioners were released from their imprisonment for these offenses, their immigration parole was revoked on the basis of their convictions. The validity of these convictions is not challenged. Final orders of exclusion were entered against petitioners; at the time of this appeal, they remain in INS custody in state or federal prisons where they have been for over two years, awaiting their return to Cuba.[5]

The aliens filed petitions for habeas corpus in the district court, contending that their continued detention is illegal. The district court denied the petitions, and this appeal followed.

### Discussion

We review *de novo* the district court's dismissal of a habeas corpus petition. *Alvarez-Mendez v. Stock,* 941 F.2d 956, 959 (9th Cir.1991), *cert. denied sub nom. Alvarez-Mendez v. Henry,* --- U.S. ----, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992).

The exclusion of aliens is a fundamental act of sovereignty. *United States ex rel. Knauff v.*

---

[4] In December 1984, Cuba and the United States reached an agreement pursuant to which Cuba was to take back 2,746 Mariel Cubans. Cuba suspended the agreement in May 1985, after only 201 excludable Cubans had been returned. In November 1987, Cuba agreed to resume implementation of the 1984 agreement. Approximately 450 excludables have returned to Cuba since 1987. The United States' position is and consistently has been that Cuba is required to take back all of its nationals who are denied admission to the United States.

[5] It appears from the record that petitioner Carlos Ocaña has been released; accordingly, his case is dismissed as moot. The record also shows that Alberto Quintero was approved for release, and that Miguel Martinez-Diaz and Ricardo Sanchez Patterson were awaiting administrative review; should any of those petitioners have been released, counsel should now promptly so inform this Court.

*Shaughnessy,* 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950); *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953) ("Courts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control"); *Jean v. Nelson,* 727 F.2d 957, 964 (11th Cir.1984) (en banc) ("the power to control the admission of foreigners is an inherent attribute of national sovereignty"), *aff'd,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). The right to exclude aliens is vested in both the legislative and the executive branches of the federal government. *Knauff v. Shaughnessy,* 338 U.S. at 542, 70 S.Ct. at 312 ("The right ... stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation"). The political branches have plenary authority to establish and implement substantive and procedural rules governing the admission of aliens. *Jean v. Nelson,* 727 F.2d at 964.

United States immigration laws create two types of proceedings in which aliens may be denied the hospitality of this country: deportation hearings and exclusion hearings. *Landon v. Plasencia,* 459 U.S. 21, 24-25, 103 S.Ct. 321, 325, 74 L.Ed.2d 21 (1982). Deportation hearings are the usual means by which aliens who have effected actual entry into this country are removed; exclusion hearings, on the other hand, are the means of proceeding against aliens who are seeking initial admission into the United States. *Id.* Aliens subject to deportation generally are granted greater substantive rights than are excludable aliens. *Id.* at 26-27, 103 S.Ct. at 326.

Although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country. *Garcia-Mir v. Smith,* 766 F.2d 1478, 1484 (11th Cir.1985); *Jean v. Nelson,* 727 F.2d at 969. We recognized this "entry fiction" in *Lynch v. Cannatella,* 810 F.2d 1363, 1370 (5th Cir.1987).

Petitioners do not challenge that they have been lawfully excluded from the United States. Instead, they claim that, because their return to Cuba is indefinite, their continued detention without further parole is unconstitutional, without proper statutory authority, and in violation of international law.

I. Constitutionality of Indefinite Detention

Petitioners raise two specific arguments alleging that their continued detention violates their constitutional rights. First, they contend that their incarceration constitutes punishment without a criminal trial, in violation of substantive due process. Second, petitioners argue that they have been deprived of a liberty interest without procedural due process.[6]

The Supreme Court has held that detention of aliens pending exclusion does not violate the aliens' constitutional rights. The leading case on this issue is *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). The respondent in that case was an immigrant alien who, although he had lived in the United States for twenty-five years, was temporarily excluded from the United States upon his return from an extended stay in Europe and was sent to Ellis Island. The Attorney General ordered his exclusion to be made permanent. When no other country would receive him, the respondent filed a petition for habeas corpus. The district court granted the petition, holding that detention after twenty-one months was excessive without proof of danger to public safety, proof which the Attorney General refused to disclose. The court of appeals affirmed.

The Supreme Court reversed. The Court held that respondent was "an entrant alien or "assimilated to [that] status' for constitutional purposes," rather than a resident alien despite his prior residency in the United States. *Mezei,* 345 U.S. at 213-14, 73 S.Ct. at 630 (quoting *Kwong Hai Chew v. Colding,* 344 U.S. 590, 597, 73 S.Ct. 472, 478, 97 L.Ed. 576 (1953)). Because his absence from the country was without authorization or reentry papers, respondent was subject to exclusion rather than deportation. The Court concluded that the continued detention of the respondent did not deprive him of any statutory or constitutional right. *Id.* 345 U.S. at 215, 73 S.Ct. at 630. *See also Fernandez-Roque v. Smith,* 734 F.2d 576, 582 (11th Cir.1984) (concluding that the denial or

---

[6]Petitioners also rely on *Foucha v. Louisiana,* --- U.S. ----, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), asserting that it supports their contention that detainees have both procedural and substantive rights to their liberty. We find *Foucha* inapposite on several grounds: (1) the detainee in *Foucha* was a citizen rather than an excludable alien, and (2) at issue in that decision was the detainee's confinement in a psychiatric facility (following a verdict of guilty but insane) after the basis for holding him in that facility had ceased to exist.

revocation of immigration parole does not rise to the level of a constitutional infringement).[7]

A. Substantive Due Process

Petitioners argue that they are being punished without a criminal trial in violation of the substantive due process guarantee of the Fifth Amendment. In making this argument, the aliens rely only on the fact and duration of their continued detention by the INS in federal or state penal institutions; they do not complain about the conditions of that detention or claim that they are subject to corporeal mistreatment. Thus the question before us is whether the detention *itself* constitutes punishment.

The focus of our inquiry is whether the detention is imposed for the purpose of punishment or whether it is merely incidental to another legitimate governmental purpose. *Schall v. Martin,* 467 U.S. 253, 268-69, 104 S.Ct. 2403, 2412, 81 L.Ed.2d 207 (1984). Because there is no evidence here of any expression of intent to punish on the part of the Government,[8] that determination generally will turn on " "whether an alternative purpose to which [the detention] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].' " *Id.* (quoting *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168-69, 83 S.Ct. 554, 567-568, 9 L.Ed.2d 644 (1963)).

The Ninth Circuit applied this test to the detention of a Mariel Cuban in *Alvarez-Mendez v. Stock.* In holding that detention of an excluded alien did not constitute illegal punishment, the court

---

[7]Petitioners seek to distinguish *Mezei* on the grounds that the Attorney General had found the alien to be a threat to national security. However, there the Attorney General refused to disclose, even *in camera,* any of his reasons or evidence for so concluding. In the present case, moreover, the petitioners have been convicted of criminal offenses and determined likely to be a threat to the community. One of the criteria considered in reviewing parole decisions is whether the alien is likely to pose a threat to the community. 8 C.F.R. § 212.12(d)(2).

[8]In the context of deportation of resident aliens, the Supreme Court has found that deportation proceedings are not intended as punishment. *Immigration and Naturalization Service v. Lopez-Mendoza,* 468 U.S. 1032, 1038-39, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984) ("A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry.... The purpose of deportation is not to punish past transgressions but rather to put an end to a continuing violation of the immigration laws."). Because aliens subject to exclusion are not entitled to the same constitutional protection as resident aliens, *Jean v. Nelson,* 727 F.2d at 968, we conclude that detention pending removal and stemming from exclusion proceedings is not intended as punishment.

concluded that protecting society from a potentially dangerous alien was a rational, non-punitive purpose for detention. *Alvarez-Mendez,* 941 F.2d at 962. The court found that the detention of the alien was not an excessive means of accomplishing that purpose because immediate removal from the country was not possible. *Id.*

Petitioners cite *Lynch v. Cannatella,* 810 F.2d 1363 (5th Cir.1987), to support their claim to substantive due process. However, they misread *Lynch.* There, sixteen Jamaican nationals stowed away on a grain barge destined for the United States. They were discovered before the vessel reached the Mississippi River and detained by the Harbor Police in New Orleans until the barge was ready to return to Jamaica. The stowaways were kept in custody for ten days, during which time they were allegedly physically mistreated by the Harbor Police.

In *Lynch,* this Court addressed the classifications based on alienage that determine the availability of constitutional rights to non-citizens. The court acknowledged that the " "entry fiction' that excludable aliens are to be treated as if detained at the border despite their physical presence in the United States determines the aliens' rights with regard to immigration and deportation proceedings," but stated that the fiction did not limit the right of excludable aliens to humane treatment while detained within the United States. *Lynch,* 810 F.2d at 1373. This Court went on to narrow this statement, however, in its holding on this issue: "We therefore hold that, *whatever due process rights excludable aliens may be denied by virtue of their status,* they are entitled under the due process clauses of the fifth and fourteenth amendments *to be free of gross physical abuse at the hands of state or federal officials.*" *Id.* at 1374 (emphasis added). Not only is the exception for gross physical abuse wholly inapplicable in this case, as the petitioners have not alleged physical mistreatment, but *Lynch* plainly recognizes that excludable aliens may legally be denied other due process rights, *including* the right to be free of detention.[9]

We hold that the continued INS detention of the petitioners is not punishment and does not

_____

[9]*See id.* at 1370 ("stowaways ... even if they are physically present in the United States ... do not possess a due process right to remain free of incarceration pending their deportation"), 1376 ( ... "the stowaways possessed no due process right to remain free of incarceration pending their deportation").

constitute a violation of the aliens' rights to substantive due process.

B. Procedural Due Process

Petitioners claim that they are entitled to the due process protections of the Fifth Amendment. The Supreme Court has held, however, that excludable aliens are entitled only to those due process rights as are provided by law. *Knauff v. Shaughnessy,* 338 U.S. at 544, 70 S.Ct. at 313 ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned"). *See also Jean v. Nelson,* 727 F.2d at 968 ("As to [excludable aliens], the decisions of executive or administrative officers, acting within powers expressly conferred by congress, are due process of law") (quoting *Nishimura Ekiu v. United States,* 142 U.S. 651, 661-62, 12 S.Ct. 336, 339, 35 L.Ed. 1146 (1892)). Thus, petitioners do not have a general right to the procedural due process guarantees of the Fifth Amendment. Their rights are determined by the procedures established by Congress.

Petitioners assert three specific claims to procedural due process in the parole process: (1) that they have a liberty interest in being paroled; (2) that they were denied due process in the revocation of their parole; and (3) that they have not been granted due process in the review of their parole determinations. We conclude that petitioners have not been denied any process due them.

Petitioners contend that they have a liberty interest in their freedom, *i.e.* in being paroled from immigration detention. Such an interest may arise from a statute, regulation, or directly from the due process clause. *Hewitt v. Helms,* 459 U.S. 460, 465-67, 103 S.Ct. 864, 868-69, 74 L.Ed.2d 675 (1983). The petitioners' interest in immigration parole is created by the immigration statutes and is subject to the exercise of discretion by the Attorney General. 8 U.S.C. § 1182(d)(5)(A).[10] The language of the statute does not require the Attorney General to parole any alien, nor does it mandate parole on any particular finding or findings or place any substantive restriction on the authority to

---

[10]8 U.S.C. § 1182(d)(5)(A) provides that

> "[t]he Attorney General may ... *in his discretion* parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien...." (Emphasis added.)

deny parole. Because petitioners' interests here are contingent upon the Attorney General's discretion, they have no liberty interest in being paroled. *See Velasco-Gutierrez v. Crossland,* 732 F.2d 792 (10th Cir.1984) (holding that illegal aliens had no due process rights to a proceeding to determine deferred action status). *See also Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 461-66, 109 S.Ct. 1904, 1909-11, 104 L.Ed.2d 506 (1989).

Further, petitioners seek the same due process rights to the initial revocation of their immigration parole as those granted to criminal parolees. Petitioners' claims concern their immigration parole rather than parole from serving a criminal sentence. Immigration parole is a part of the admissions process, and its denial or revocation does not rise to the level of a constitutional infringement. *Fernandez-Roque v. Smith,* 734 F.2d at 582. *See also Alvarez-Mendez v. Stock,* 941 F.2d at 963 ("Parole decisions are an integral part of the admissions process and excludable aliens cannot challenge such decisions as a matter of constitutional right"); *Ahrens v. Rojas,* 292 F.2d 406, 410 (5th Cir.1961) (revocation of alien's immigration parole without a hearing did not violate alien's rights).

Finally, petitioners claim that their rights to procedural due process have been violated by their continued detention without parole because the parole review procedures are constitutionally insufficient. Federal regulations exist that set forth explicitly the procedure for parole determinations concerning the Mariel Cubans. 8 C.F.R. §§ 212.12, 212.13. The section 212.12 regulations establish findings that must be made before recommending parole, factors to be considered in determining whether to recommend parole, and the procedures for review hearings.[11] Petitioners do not contend

[11]8 C.F.R. § 212.12 grants Mariel Cubans in immigration detention an annual review for parole determinations by a Cuban Review Panel. This review includes a personal interview of the detainee by the panel if parole is not recommended after a review of the alien's file. Section 212.12(d)(4). The panel, designated by the Director of the Cuban Review Plan, considers factors such as the detainee's past history of criminal behavior, his behavior while in custody, his ties to the United States, and the likelihood that he may abscond from a sponsorship program. Section 212.12(d)(3) ("The following factors should be weighed in considering whether to recommend further detention or release on parole"). In order to recommend an alien for parole, the panel *must* first conclude that: (1) the detainee is presently a nonviolent person; (2) the detainee is likely to remain nonviolent; (3) the detainee is not likely to pose a threat to the community following his release; and (4) the detainee is not likely to violate the conditions of his parole. 8 C.F.R. § 212.12(d)(2) ("Before making any recommendation that a detainee be granted parole ... [the panel] must conclude that").

that these procedures were not followed here.

We hold that petitioners have not been denied procedural due process.

II. Statutory Authority of the Attorney General

Petitioners do not challenge the Attorney General's power to exclude them nor his authority to revoke their immigration parole and detain them pending exclusion.[12] Rather, they contend that the Attorney General lacks the authority to detain them indefinitely.[13]

The Immigration and Nationality Act (INA) confers on the Attorney General the authority to administer and enforce the INA; this power includes the power to detain or parole excluded aliens

---

8 C.F.R. § 212.13 allows aliens who have been denied parole under the above procedures to request a single review by a special Department Panel. Section 212.13(a), (b). This panel is established by the Associate Attorney General, and includes three individuals from within the Justice Department, one of whom must be an attorney and one a representative of the Community Relations Service. No INS representative serves. Section 212.13(c). The detainee is allowed to submit to the Department Panel a written statement setting forth factors he considers relevant to the parole consideration; a member of the Department Panel may interview the detainee. Section 212.13(e), (f).

Although section 212.12 establishes criteria to be considered by the review panel there provided for in determining whether to recommend parole, and requires certain findings *before* a recommendation may be made that parole be granted, section 212.12(d), it does not go so far as to mandate or require a recommendation of parole in *any* case. *See Kentucky Dept. of Corrections,* 490 U.S. at 462-66, 109 S.Ct. at 1910-1911 (substantive predicates to guide decision, or which establish situations in which visitation must be denied, do not suffice to create liberty interest in allowing visitation, where they do not *mandate* its allowance on any particular set of findings). In any event, the final decision under section 212.12 is left to the discretion of the Commissioner, acting through the Associate Commissioner, sections 212.12(b); 212.12(d)(4)(iii), and the criteria set out in section 212(d)(2) & (3) are not expressly made applicable to the Department Panel provided for in section 212.13. Further, the establishment by the regulations of procedures to guide decision making in this area does not create any general due process rights. *See Olim v. Wakinekona,* 461 U.S. 238, 250-51, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983).

[12]Were petitioners to contest these points, they would be precluded by precedent in this Circuit. This Court has held that revocation of immigration parole without a hearing was as a matter of law not an abuse of discretion, and that the Attorney General could legally hold an excluded alien in custody when he determined that parole is not in the public interest and immediate deportation is impossible. *Ahrens v. Rojas,* 292 F.2d 406, 408, 410-12 (5th Cir.1961).

[13]Petitioners base their contention that their detention is unreasonably indefinite on a belief that they are not included in the list of Mariel aliens to be returned to Cuba pursuant to the 1984 repatriation agreement with Cuba because they were not in INS custody at the time of the agreement.

prior to deportation. 8 U.S.C. §§ 1103, 1182.

Amendments to the INA in 1990 and 1991 distinguish between aliens who have been convicted of aggravated felonies and those who have not. Although these amendments became effective after revocation of petitioners' immigration parole, they may properly be considered in this discussion because our concern is with the legality of petitioners' present detention. *See Alvarez-Mendez v. Stock,* 941 F.2d at 960. Petitioners fall into both categories.[14]

A. Aliens Convicted of Aggravated Felonies

It is clear in the context of deportation proceedings that the Attorney General may detain aliens convicted of aggravated felonies. 8 U.S.C. § 1252(a)(2)(B), as amended by § 504(a)(5) of the Immigration Act of 1990 and § 306(a)(4) of the Immigration Technical Corrections Act of 1991, provides that

> "[t]he Attorney General may not release from custody any lawfully admitted alien who has been convicted of an aggravated felony, either before or after a determination of deportability, unless the alien demonstrates to the satisfaction of the Attorney General that such alien is not a threat to the community and that the alien is likely to appear before any scheduled hearings."

This provision is limited by its terms to lawfully admitted aliens who are subject to deportation; it does not apply to petitioners, who are excluded aliens. A similar amendment in the context of 8 U.S.C. § 1226(e), pertaining to exclusion, was introduced in 1991 but was not adopted by Congress.[15]

The Ninth Circuit, in *Alvarez-Mendez v. Stock,* acknowledged the lack of a corresponding

---

[14]The aggravated felon category includes petitioners Perez, Castellon, Arguez-Perez, and Martinez, who have all been convicted of drug trafficking offenses. 8 U.S.C. § 1101(a)(43). Other petitioners who may fall within this category on the basis of convictions for crimes of violence (as defined in 18 U.S.C. § 16) include Gisbert (aggravated assault with intent to commit robbery), Garcia (attempted murder in the second degree), Ocaña (aggravated assault with a deadly weapon), and Asevedo (aggravated assault). Finally, Carbonell may also be included on the basis of a prior murder conviction in Cuba. 8 U.S.C. § 1103(a)(43) (applicable offenses in violation of foreign law are included if the term of imprisonment was completed within the previous fifteen years).

[15]The rejected amendment to section 1226(e) would have provided that "the Attorney General may not release from custody any alien convicted of an aggravated felony, either before or after a determination of excludability, unless [found not to be a threat to the community]." S. 1620, 102nd Cong., 1st Sess., 137 Cong.Rec. 11,802 (1991). (Provision rejected, H.R. 3049, 102nd Cong., 1st Sess., 137 Cong.Rec. 11,491 (1991).)

amendment in the context of exclusion proceedings but interpreted section 1226(e), first enacted in November 1990, to fill the gap.[16]  The court reasoned that to allow the Attorney General to detain deportable aliens, without providing the same authority regarding excludable aliens, would "undermine Congress' attempt to protect society from dangerous aliens" and "would be contrary to accepted tenets of U.S. immigration law, which treat aliens subject to deportation more favorably than those seeking initial admission." *Alvarez-Mendez,* 941 F.2d at 961-62.

The Ninth Circuit held that the Attorney General has explicit statutory authority to continue the detention of excludable aliens convicted of aggravated felonies based on its interpretation of 8 U.S.C. § 1226(e).  *Alvarez-Mendez,* 941 F.2d at 962.  8 U.S.C. § 1226(e)(1) provides that the Attorney General "shall" detain, "[*p* ]*ending a determination of excludability,*" aliens who have been convicted of an aggravated felony.  (Emphasis added.)  Section 1226(e)(2) qualifies subsection (1): "*Notwithstanding any other provision of this section,* the Attorney General *shall not* release such felon from custody unless the Attorney General determines that the alien may not be deported

---

[16]Section 1226(e) was added to the INA by P.L. 101-649, Title V, § 504(b), 104 Stat. 5050, 101st Cong. 2nd Sess., November 29, 1990.  It was amended by a not presently relevant amendment to its paragraph (1), to read in its present form by P.L. 102-232, Title III, § 306(a)(5), 105 Stat. 1751, 102nd Cong., 1st Sess., December 12, 1991.  Section 1226(e) provides:

"(1) Pending a determination of excludability, the Attorney General shall take into custody any alien convicted of an aggravated felony upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation and regardless of the rearrest or further confinement in respect of the same offense).

(2) Notwithstanding any other provision of this section, the Attorney General shall not release such felon from custody unless the Attorney General determines that the alien may not be deported because the condition described in section 1253(g) of this title exists.

(3) If the determination described in paragraph (2) has been made, the Attorney General may release such alien only after—

(A) a procedure for review of each request for relief under this subsection has been established,

(B) such procedure includes consideration of the severity of the felony committed by the alien, and

(C) the review concludes that the alien will not pose a danger to the safety of other persons or to property."

because the condition described in section 1253(g) of this title exists."[17] (Emphasis added.) If subsection (2) is satisfied, nevertheless "the Attorney General *may* release such alien *only* after" he concludes on review that "the alien will not pose a danger to the safety of other persons or to property." Section 1226(e)(3) (emphasis added).

While we are inclined to agree with the general approach of the Ninth Circuit in *Alvarez-Mendez,* we do not regard section 1226(e) as a limitation on the Attorney General's authority to detain excludable aliens, either before or after final determination of excludability, pending their removal from this country. Section 1226(e), first enacted in 1990, is written in this respect as a limitation on the Attorney General's power to *release,* or *not* to detain, and is not written as a grant of or limitation on his power to detain. Rather, it appears to assume such power. As explained below, we believe the Attorney General has implicitly been granted the power to detain in these circumstances.

B. Aliens Not Convicted of Aggravated Felonies

At all events, the INA does not expressly grant the authority to detain indefinitely those excluded alien petitioners who have not been convicted of aggravated felonies but who cannot be immediately deported.[18] Courts addressing the issue, however, conclude that "Congress *implicitly* authorized the Attorney General to order such detention." *Palma v. Verdeyen,* 676 F.2d 100, 104 (4th Cir.1982) (emphasis added). *See also Fernandez-Roque v. Smith,* 734 F.2d at 580 (affirming the district court's finding that the government had statutory authority to detain Mariel Cubans indefinitely when immediate exclusion was not practical).

---

[17]Section 1253(g) concerns a situation where "any country upon request denies or unduly delays acceptance or the return of any alien who is a national, citizen, subject, or resident thereof...." Thus if Cuba again repudiated its agreement to accept the Mariel Cubans, section 1226 would no longer apply.

[18]*Cf.* 8 U.S.C. § 1252(c), where the INA does provide an express time limit for detention in deportation cases. This provision, not limited to dangerous felons, requires the Attorney General to deport the alien within six months of the final order of deportation or final order of a court if the administrative action is judicially reviewed. There is no equivalent requirement in exclusion cases, indicating to the courts that Congress intended to authorize more stringent restrictions on the freedom of excluded aliens than those imposed on resident aliens. *Palma v. Verdeyen,* 676 F.2d 100, 104 (4th Cir.1982).

The Attorney General's implicit authority to detain excludable aliens is not unlimited, however, as the return of the alien must be immediate "unless the Attorney General ... in his discretion, concludes that immediate deportation is not practicable or proper." 8 U.S.C. § 1227(a). The Fourth Circuit held that the Attorney General had complied with this provision by instituting procedures to review each alien's case. *Palma v. Verdeyen,* 676 F.2d at 104. We agree. These procedures, which have been followed in the present case, are set forth in 8 C.F.R. §§ 212.12, 212.13.

Petitioners rely on *Rodriguez-Fernandez v. Wilkinson,* 654 F.2d 1382 (10th Cir.1981), to contest the authority of the Attorney General to detain them indefinitely. In *Rodriguez,* the Tenth Circuit held that the INA did not permit indefinite detention as an alternative to exclusion. 654 F.2d at 1389-90. Several factors distinguish that case from the one before us. In *Rodriguez,* the Attorney General determined the alien to be suitable for parole, but detention was continued because the government stayed parole releases while it re-examined its parole policy in light of the situation created by the Mariel Cubans. Further, *Rodriguez* was decided in 1981, before Cuba agreed to accept the return of any Mariel Cubans. Finally, the immigration regulations have been amended since the Tenth Circuit decided *Rodriguez. Marczak v. Greene,* 971 F.2d 510, 514 & n. 7 (10th Cir.1992).[19]

In contrast, in the present case each of the petitioners has been determined not suitable for parole. Although the timing of the petitioners' return to Cuba is uncertain, the United States is continuing its negotiations with Cuba to effect this return.

To the extent that *Rodriguez* is not distinguishable from the present appeal, we decline to agree with the Tenth Circuit's reasoning there, and instead align ourselves with more recent cases that have upheld the Attorney General's authority to detain Mariel Cubans indefinitely. In *Palma v. Verdeyen,* the Fourth Circuit reversed the district court's grant of habeas corpus, stating that "indefinite detention of a permanently excluded alien deemed to be a security risk, who is refused

---

[19]Another distinguishing factor of *Rodriguez* was that the alien had never been paroled after his arrival in the United States and thus had committed no crimes in this country. We must be careful in distinguishing *Rodriguez* on this ground, however. Although petitioners have committed crimes in this country, they have already served their sentences for those crimes.

entry to other countries, is not unlawful." *Palma,* 676 F.2d at 103 (citing *Mezei,* 345 U.S. 206, 73 S.Ct. 625). *See also Fernandez-Roque v. Smith,* 734 F.2d at 580 ("[T]he government had statutory authority to detain aliens indefinitely in those cases where immediate exclusion" was not practical).

We conclude that the INA authorizes the Attorney General to continue to detain petitioners, whether or not they have been convicted of aggravated felonies, until the United States is able to deport them.

We do not suggest that the Attorney General would have the authority to continue to indefinitely detain petitioners if he refused to allow their deportation to a country that was willing and able to accept them; at least absent circumstances now difficult to conceive, that would doubtless be essentially punitive and hence improper as an administrative action without the due process appropriate thereto. *Wong Wing v. United States,* 163 U.S. 228, 237-38, 16 S.Ct. 977, 980-81, 41 L.Ed. 140 (1896). However, this is not the situation before us.[20] Petitioners are not requesting that the United States attempt to send them to Cuba or to a third country. They want to be admitted physically into the United States. This would, in effect, bestow on these aliens the very rights that were denied them when their immigration parole was revoked on the basis of their criminal activity in the United States.

Accepting petitioners' arguments here would allow one country to export its unwanted nationals and force them upon another country by the simple tactic of refusing to accept their return. *See Jean v. Nelson,* 727 F.2d at 975 ("A foreign leader could eventually compel us to grant physical admission via parole to any aliens he wished by the simple expedient of sending them here and then refusing to take them back"). The United States cannot be forced to violate its national sovereignty in order to parole these aliens within its borders merely because Cuba is dragging its feet in repatriating them. *See Lynch,* 810 F.2d at 1373 ("Courts ordinarily should abstain from placing limits on government discretion in these circumstances because the sovereign interest in self-determination weighs so much more heavily in this scheme than does the alien's interest in entering the country").

---

[20]Nor do we address the precise conditions or nature of the detention. Petitioners' only complaint is that they are institutionally detained instead of being paroled into the general population.

III. Public International Law Claims

Public international law has been incorporated into the common law of the United States, *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900); *Garcia-Mir v. Meese,* 788 F.2d 1446, 1453 (11th Cir.), *cert. denied,* 479 U.S. 889, 107 S.Ct. 289, 93 L.Ed.2d 263 (1986), and we are thus bound to construe the federal common law, to the extent reasonably possible, to avoid violating principles of public international law. Public international law controls, however, only "where there is no treaty and no controlling executive or legislative act or judicial decision...." *Garcia-Mir v. Meese,* 788 F.2d at 1453 (quoting *The Paquete Habana,* 175 U.S. at 700, 20 S.Ct. at 299).[21]

Petitioners contend their incarceration violates principles of public international law that prohibit prolonged arbitrary detention. Although we have not previously addressed this issue, other circuits have held in the context of immigration detention that international law is not controlling because federal executive, legislative, and judicial actions supersede the application of these principles of international law.

In *Garcia-Mir v. Meese,* the Eleventh Circuit, addressing a situation similar to that now before this Court, found that the decision of the Attorney General to incarcerate excluded Mariel Cubans indefinitely pending efforts to deport them constituted a controlling executive act sufficient to prevail over international law. 788 F.2d at 1454-55. The court went on to assert that, even if the executive act were found insufficient, the Supreme Court's decision in *Mezei* would be a judicial decision sufficient to meet the test of *The Paquete Habana. Id.* at 1455.

The Ninth Circuit focused on the controlling act of the legislature in enacting the Immigration and Nationality Act. *Alvarez-Mendez v. Stock,* 941 F.2d at 963. It found that international law did not require the release of the aliens where the Immigration and Nationality Act authorized the Attorney General to detain them. "[W]e are bound by a properly enacted statute, provided it be

---

[21]Petitioners contend that the principle quoted from *The Paquete Habana* is merely dictum and should not control here. This ignores the acceptance of this principle in subsequent decisions. *See Committee of U.S. Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 939 (D.C.Cir.1988); *Alvarez-Mendez v. Stock,* 941 F.2d at 963; *Garcia-Mir v. Meese,* 788 F.2d at 1453-55.

constitutional, even if that statute violates international law." *Id.*

The immigration statutes, Attorney General actions, and *Mezei,* are equally applicable here. We concur with the decisions of the Eleventh and Ninth Circuits in this respect and hold that international law does not require the release of the petitioners where these legislative, executive, or judicial decisions exist to the contrary.

Petitioners also contend that prolonged arbitrary detention is a violation of fundamental human rights law, or *jus cogens.*[22] *Committee of U.S. Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 941 (D.C.Cir.1988). Although the *Nicaragua* court recognized that human rights law prohibits prolonged arbitrary detention, it did not decide that doctrines of *jus cogens* supersede domestic law, nor did it address the present situation of immigration detention. Petitioners did not raise this particular claim in the district court and thus are barred from bringing it here. *United States v. Sherbak,* 950 F.2d 1095, 1101 (5th Cir.1992). In any event, we do not construe international human rights law as requiring that the United States accept the Mariel Cubans under these circumstances. As we noted above, it would be entirely different if Cuba or another country were willing and able to take these aliens and the United States refused to allow them to leave. This is not the case, however, as it is in the interest of the United States to return these aliens; the detention of the aliens within the United States is at the taxpayers' expense and constitutes a security risk within our already crowded prison systems.[23]

## Conclusion

We hold that, under these circumstances, the continued detention, though indefinite, of the petitioners does not violate the petitioners' constitutional rights; that ordering such detention is within the discretionary power of the Attorney General; and that principles of international law do not

---

[22]*Jus cogens* describes peremptory norms of law which are nonderogable and form the highest level of international law. *Committee of U.S. Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 940 (D.C.Cir.1988).

[23]In 1987, the announcement of the reinstatement of the 1984 repatriation agreement with Cuba sparked riots among Mariel Cubans detained in federal detention centers in Atlanta, Georgia, and Oakdale, Louisiana. The center in Louisiana was substantially destroyed. *Buchanan v. United States,* 915 F.2d 969, 969-970 (5th Cir.1990); *see also Ramos v. Thornburgh,* 761 F.Supp. 1258, 1262 (W.D.La.1991).

operate to prohibit their detention.  The judgment of the district court is AFFIRMED.[24]

---

[24]Except that as to petitioner Carlos Ocaña the judgment is modified so as to dismiss his suit as moot (see note 5, *supra* ).