# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-40017

United States Court of Appeals
Fifth Circuit

**FILED**

January 30, 2014

Lyle W. Cayce
Clerk

LAURA NANCY CASTRO;
YULIANA TRINIDAD CASTRO, Individually and as Next Friend of C.A.G.;
JESSICA GARCIA; RODRIGO SAMPAYO; ANA ALANIS,

Plaintiffs–Appellants,

TRINIDAD MURAIRA DE CASTRO,

Appellant,

versus

ELISEO CABRERA,

Defendant–Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, JOLLY, and SMITH, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Laura Castro, Yuliana Castro (individually and as next friend of C.A.G.), Jessica Garcia, Rodrigo Sampayo, Ana Alanis, and Trinidad de Castro

No. 13-40017

(collectively "the detainees") brought *Bivens* claims[1] against Eliseo Cabrera alleging violations of their Fourth Amendment right to be free of unreasonable seizures.[2]  Cabrera, asserting qualified immunity, moved for dismissal under Federal Rule of Civil Procedure 12(b)(6).  The district court granted Cabrera's motion to dismiss, and we affirm.

I.

There are three separate incidents of alleged misconduct and seven detainees.  We therefore address separately the facts of each incident and group of detainees.

A.

Trinidad de Castro is a Mexican citizen and the mother of Laura and Yuliana Castro, each of whom has a birth certificate from the United States and Mexico.  Yuliana is the mother of the infant C.A.G.  In August 2009, the Castros applied for entry at the original Brownsville & Matamoros International Bridge.  Laura presented the border agents with a U.S. passport, Yuliana presented a Texas birth certificate, Texas identification card, the receipt for her U.S. passport, and the Texas birth certificate of C.A.G., and Trinidad presented her laser visa.  Officer Cabrera noted that Yuliana's birth certificate reflected a midwife[3] birth and, finding that suspicious, took the Castros to secondary inspection, where Cabrera allegedly interrogated and threatened them

---

[1] *See Bivens v. Six Unknown Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

[2] Although the detainees brief possible due-process violations under the Fifth Amendment, those claims were not asserted in the second amended complaint and thus are not properly before this court.

[3] The midwife who delivered Laura and Yuliana was on a list of suspicious midwives.

during a detention of about ten hours.

Near the end of that time, Trinidad signed a statement that Yuliana and Laura had been born in Mexico. The Castros allege that that amounted to a false confession "[b]ased on threats, fear, hunger, exhaustion, and her inability to continue listening to the cries of her infant granddaughter, C.A.G., complicated by her own the [sic] delicate medical condition, and awareness of the medical vulnerability of the others." Based on the statement, Cabrera allegedly confiscated their documentation and denied all four entry into the United States, releasing them back to Mexico. No specific allegations were made in the pleadings regarding what constituted the alleged threats.

### B.

Sampayo has birth certificates from the United States and Mexico. Although a midwife registered his birth in the United States several months after it occurred, he grew up in Mexico using his Mexican birth certificate and at one point even had a border crossing card issued by INS. In early 2009, however, he applied for a U.S. passport and was asked for further documentation because his midwife was on a list of suspicious midwives.

In September of that year, Sampayo applied for entry at the original Brownsville & Matamoros International Bridge. He presented his U.S. birth certificate, Texas driver's license, and the receipt for his U.S. passport. Cabrera noted that his birth certificate reflected a midwife birth and that it was filed several months after his birth. Cabrera then took Sampayo to secondary inspection where he was detained for about six hours and allegedly was interrogated regarding his birth and was threatened "that if he did not 'admit' foreign birth, he would be detained."

After about six hours, Sampayo signed a statement prepared by Cabrera admitting the falsity of his birth certificate. Based on that, Cabrera allegedly

confiscated Sampayo's documentation, denied him entry, and released him back to Mexico. In early 2010, Sampayo's passport application was denied, in part because of his signed statement that he had been born in Mexico.


C.

Garcia has birth certificates from the United States and Mexico. Her U.S. birth certificate shows a "midwife birth" and that her attending midwife was the same as both Laura and Yuliana Castro's. Her Mexican birth certificate was registered about one month later. In early 2009, she applied for a U.S. passport.

In October 2009, while her application was pending, Garcia applied for entry at the second Brownsville & Matamoros International Bridge. She presented her U.S. birth certificate, Texas identification card, and the receipt for her U.S. passport. Cabrera noted the midwife birth and asked whether she had a Mexican birth certificate; when Garcia answered in the negative, he took her to secondary inspection. After Garcia had been locked in a small room for about thirty minutes, Cabrera arrived with Garcia's Mexican birth certificate and allegedly stated that he believed her U.S. birth certificate to be fraudulent and "began to hurl threats and insults at her, and make false representations."

Alanis, Garcia's mother, also came to the port of entry to explain why Garcia had two birth certificates and insisting that Garcia was born in the United States; Alanis was allegedly subjected to "threats, insults, and false statements" by Cabrera. No specific allegations were made in the pleadings, however, regarding what constituted these alleged threats or insults. Eventually, when neither Garcia nor Alanis had "confessed" to Garcia's having been born in Mexico, Cabrera issued Garcia a notice to appear, confiscated her documentation, and released her and her mother back to Mexico.

No. 13-40017

D.

In July 2012, the detainees filed their second amended complaint in which they assert *Bivens* violations of the Fourth Amendment against Cabrera in his individual capacity.  They claim to have been "wrongfully detained" and that Cabrera "intentionally acted unreasonable [sic] in utilizing threats, separation, intimidation, and false representations to coerce[] Plaintiffs [sic] statements."  Cabrera moved to dismiss for failure to state a claim for which relief could be granted under Rule 12(b)(6).  The district court granted the motion on the basis of qualified immunity.

II.

We review *de novo* a dismissal for failure to state a claim.  *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).  "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).

III.

Before addressing qualified immunity, we decide the threshold question whether the Fourth Amendment applies to these detainees.  As a general matter, it applies to aliens within U.S. territory.[4]  In *Verdugo-Urquidez*, however, the Court held, 494 U.S. at 261, that it does not apply to the search and seizure

---

[4] *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 1990 ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."); *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 624–25 (5th Cir. 2006).

of nonresident aliens on foreign soil.[5]  Moreover, excludable aliens that have been denied entry into the United States, even when technically within U.S. territory, may be "treated, for constitutional purposes, as if stopped at the border."[6]  That is the doctrine of "entry fiction," which is applied to excludable aliens regarding the constitutionality of indefinite detention and, more specifically, the applicability of substantive and procedural due process rights under the Fifth Amendment.[7]

There are limitations to our application of entry fiction.  In *Lynch*, we specifically confined it to the contexts of immigration and deportation and held that it "does not limit the right of aliens detained within the United States territory to humane treatment."[8]  For purposes of this exception, we have interpreted "humane treatment" as being denied only in those cases involving "gross

---

[5] *See also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[C]ertain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders."); *Johnson v. Eisentrager*, 339 U.S. 763, 781–85 (1950) (rejecting extraterritorial application of the Fifth Amendment).

[6] *Zadvydas*, 533 U.S. at 693 (citation and internal quotation marks omitted); s*ee also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215–16 (1953) (holding that an excluded alien's indefinite detention on Ellis Island did not violate constitutional law because "he is treated as if he stopped at the border"); *Gisbert v. United States Att'y Gen.*, 988 F.2d 1437, 1440–44 (5th Cir. 1993) ("Although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country.").

[7] *Gisbert*, 988 F.2d at 1440–44 ("The Supreme Court has held that detention of aliens pending exclusion does not violate the aliens' constitutional rights.") (citing *Shaughnessy*, 345 U.S. at 213–15); *see also Lynch v. Cannatella*, 810 F.2d 1363, 1370 (5th Cir. 1987); *Martinez-Aguero*, 459 F.3d at 622–23; *cf. Kwai Fun Wong v. United States*, 373 F.3d 952, 974−75 (9th Cir. 2004) (holding that entry fiction does not preclude claims under the equal-protection component of the Due Process Clause).

[8] *Lynch*, 810 F.2d at 1373−75; *see also Martinez-Aguero*, 459 F.3d at 623 (citing *Lynch* in holding that entry fiction did not apply to Fourth Amendment claims based on gross physical abuse at the hands of federal officials).

physical abuse."[9]

Therefore, if these detainees are excludable aliens stopped before entry into the United States and their claims arise in the context of immigration, the entry fiction applies and there is no violation of the Fourth Amendment. If, however, they were subject to wanton or malicious infliction of pain or gross physical abuse, the doctrine does not apply, and we consider whether Cabrera was entitled to qualified immunity.

A.

The entry fiction applies to the detainees' claims that their Fourth Amendment rights were violated. Unlike the situation in *Martinez-Aguero*, in which we held the entry fiction not to apply to an excluded alien's false-imprisonment claim, the detainees' claims are in the context of immigration, and no gross physical abuse is alleged. In *Martinez-Aguero*, an excluded alien was beaten and arrested for interfering with the performance of official duties when, after she was denied entry to the United States on an expired visa, she made a sarcastic remark regarding the official's foul language and began to walk toward Mexico. *Martinez-Aguero*, 459 F.3d at 620–21, 625. We therefore held that the entry fiction did not apply because the official's actions occurred outside the immigration context—the alien was no longer attempting to enter the United States; her detention was not in regard to her immigration status

---

[9] *Gisbert*, 988 F.2d at 1442 ("The court [in *Lynch*] acknowledged that the "'entry fiction" that excludable aliens are to be treated as if detained at the border despite their physical presence in the United States determines the aliens' rights with regard to immigration and deportation proceedings,' but stated that the fiction did not limit the right of excludable aliens to humane treatment while detained within the United States. This Court went on to narrow this statement: 'We therefore hold that, *whatever due process rights excludable aliens may be denied by virtue of their status*, they are entitled under the due process clauses of the fifth and thirteenth amendments *to be free of gross physical abuse at the hands of state or federal officials*.'" (quoting *Lynch*, 810 F.2d at 1374 (emphasis added))).

No. 13-40017

but for the commission of a nonrelated crime—and involved gross physical abuse. *Id.* at 623–25.

The detainees, however, were detained as excluded aliens for varying amounts of time—all ten hours or less—as their admissibility was being determined, a situation well within the immigration context. Additionally, neither of the claims involve physical abuse, let alone "gross physical abuse" as in *Lynch* or *Martinez-Aguero*. Therefore, these claims fall squarely within the confines of entry fiction, and the Fourth Amendment is not applicable; the detention did not violate constitutional rights[10]; and the district court properly dismissed these claims under Rule 12(b)(6).

## B.

Lastly, we decide whether the entry fiction applies to the detainees' Fourth Amendment claim of excessive force through the use of harsh interrogation techniques. Although we held in *Lynch* and *Martinez–Aguero* that the entry fiction did not apply to the excessive-force claims under, respectively, the Fifth and Fourth Amendments, we did so because the fiction does not apply to "gross physical abuse at the hands of state or federal officials." *Martinez–Aguero*, 459 F.3d at 623; *Lynch*, 810 F.2d at 1373–74. The present detainees do not allege *any* physical contact but make bare assertions of "threats, insults, and false statements." These accusations, without any allegation of conduct that could be considered "gross physical abuse" or the wanton or malicious

---

[10] *See id.*, 988 F.2d at 1441 ("The Supreme Court has held that detention of aliens pending exclusion does not violate the alien's constitutional rights." (citing *Shaughnessy*, 345 U.S. at 209–13 (holding that detention of excludable alien at border entry for twenty-one months did not violate any constitutional rights)); *see also id.* at 1442 ("Not only is the exception for gross physical abuse wholly inapplicable in this case, as the petitioners have not alleged physical mistreatment, but *Lynch* plainly recognizes that excludable aliens may legally be denied other due process rights, *including* the right to be free of detention.").

No. 13-40017

infliction of pain, do not meet our standard for avoiding application of the entry fiction.[11] Therefore, the fiction applies to the Fourth Amendment claim, which was properly dismissed.

## IV.

Alien detainees—including those who present facially valid documentation—have no Fourth Amendment rights in the immigration context.[12] Fourth Amendment protection extends, however, to all detainees who are citizens of the United States because the doctrine of entry fiction applies only to *aliens*, not U.S. citizens. Some of the detainees here—such as Laura and Yuliana Castro, who presented facially valid documentation[13]—might in fact be U.S. citizens and certainly allege to be so.

Even if they individuals are in fact U.S. citizens, dismissal is proper because Cabrera enjoys qualified immunity,[14] as the district court convincingly discussed in its order of dismissal. The detainees point to no authority clearly establishing that Cabrera's actions in detaining, even for as long as ten hours, individuals who presented facially valid documentation, plus the use of unspecified threats and insults during interrogation, violated the

---

[11] *See id.* at 1442 ("[T]he exception for gross physical abuse [is] wholly inapplicable in this case, as the petitioners have not alleged physical mistreatment.").

[12] Any contrary understanding would impose a legal regime in which the act of fraud itself created constitutional protection for an imposter.

[13] The infant, C.A.G., also presented facially valid documentation for a child under sixteen when a valid U.S. birth certificate was presented on her behalf, *see* 8 C.F.R. § 235.1(b)(8)(i), but—as the district court discussed—she was never legally detained even if the practical effect of Laura's, Yuliana's, and her grandmother's detention resulted in her physical detention.

[14] "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

No. 13-40017

Constitution.[15]   Instead, the caselaw of the Supreme Court[16] and of this circuit,[17] as well as federal regulations,[18] are to the contrary.  Therefore, the claims of any of the detainees who might be U.S. citizens were properly dismissed.

Because the Fourth Amendment does not apply to those detainees that are aliens, and Cabrera is entitled to qualified immunity in relation to those detainees that are U.S. citizens, the judgment of dismissal is AFFIRMED.

---

[15] "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (citing *Harlow*, 457 U.S. at 818).

[16] *See United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985) ("Consistently, therefore, with Congress' power to protect the Nation by stopping and examining persons entering this country, the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than the interior.  Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant, and first class mail may be opened without a warrant on less than probable cause. Automotive travelers may be stopped at fixed checkpoints near the border without individualized suspicion even if the stop is based on ethnicity, and boats on inland waters with ready access to the sea may be hailed and boarded with no suspicion whatever." (citations and footnote omitted)); *United States v. Martinez-Fuerte*, 428 U.S. 543, 562–63 (1976) ("[W]e hold that the stops and questioning at issue may be made in the absence of any individualized suspicion at reasonably located checkpoints.").

[17] *Hernandez v. Cremer*, 913 F.2d 230, 239–41 (5th Cir. 1990) (upholding an injunction which allowed an inspecting officer twenty-four hours to complete an investigation into the citizenship of a person who presented documentation evidencing citizenship at a port of entry).

[18] *See* 8 C.F.R. § 235.1(b) ("A person claiming U.S. citizenship must establish that fact to the examining officer's satisfaction and must present a U.S. passport or alternative documentation as required by 22 CFR part 53.  If such applicant for admission fails to satisfy the examining immigration officer that he or she is a U.S. citizen, he or she shall thereafter be inspected as an alien.").

No. 13-40017

STEWART, Chief Judge, concurring in the judgment.

I concur in the judgment only. The majority opinion addresses: (1) whether the Fourth Amendment applies to these detainees because they are not U.S. citizens; and (2) whether Cabrera enjoys qualified immunity if some of the detainees are U.S. citizens. This case raises important issues regarding the constitutional rights of detainees at the border. However, the record and the briefing in this case is less than clear on the issue of the detainees' citizenship and how this affects the Fourth Amendment analysis. I agree with the majority, as discussed in Part IV of the opinion, that Cabrera is entitled to qualified immunity. Because of the lack of clarity and sharpness in the development of the constitutional issue by the parties, I would affirm the district court's dismissal solely on the basis of Cabrera's qualified immunity.