Alexis **BARRERA–ECHAVARRIA,** Petitioner–Appellee,

v.

Richard H. **RISON,** Warden, Respondent–Appellant.

No. 93–56682.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 1994.

Decided March 31, 1994.

Emily Anne Radford, U.S. Dept. of Justice, Washington, DC, for respondent-appellant.

Karen N. Fredriksen, and Mark D. Kemple, Gibson, Dunn & Crutcher, Los Angeles, CA, for petitioner-appellee.

Lucas Guttentag, Ann Parrent, New York City, for amici curiae, American Civil Liberties Union, American Immigration Law Foundation/Legal Action Center, Mexican American Legal Defense and Educ. Fund, and Asian American Legal Defense and Educ. Fund.

Paul Hoffman (Bruce Hall and Cassondra Williams, Law Students), Los Angeles, CA, for amicus curiae, ACLU of Southern California.

Charles D. Weisselberg, Michael J. Brennan, Dennis E. Curtis, Carrie L. Hempel (Guy C. Galambos, Seth M.M. Stodder and Lesley D. Young, Law Students), Los Angeles, CA, for amici curiae, Nat. Legal Aid and Defender Ass'n, Nat. Ass'n of Criminal Defense Lawyers, and California Attys., for Criminal Justice.

Before: BROWNING, SNEED and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

The United States appeals from the order of the district court granting a writ of habeas corpus to Alexis Barrera–Echavarria, one of the large group of so-called Mariel Cubans who came to these shores in May 1980. He has been found to be an excluded alien, and his return to Cuba has been ordered. Cuba has refused to take him back, and no other country has been identified as willing to accept him. The Immigration and Naturalization Service (INS), confronted with this intractable situation, has had him confined in federal prisons since 1985. The district court held that the confinement was without statutory authority and, further, that continued imprisonment constituted punishment of Barrera in violation of the Fifth and Sixth Amendments. We affirm the grant of the writ.

The writ issued by the district court requires the Attorney General to release Barrera to a halfway house or some other form of supervised release program. Barrera does not challenge the propriety of such supervised release. We have no reason to pass upon such custody, and this opinion does not address it.

### DISCUSSION

■ Barrera is not a citizen; he is not a resident alien; he is an excluded alien, who in a legal sense has not entered this country. It is not disputed that he is a person. He is a person within our jurisdiction. As a person he is protected by the Fifth Amendment to the Constitution of the United States. *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

■ It is also common ground between the parties that neither Barrera nor any other person may be punished by the United States without a conviction following a trial. *Wong Wing v. United States,* 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896). The first question, then, for decision is whether the prolonged incarceration in federal prisons to which he has been subjected constitutes punishment. Common sense says yes, but common sense is not always right. The government argues that he is being subjected to preventive detention, a detention only imposed because it is the only way to achieve the object of the immigration laws that bar from the country excluded aliens. Drop the detention, says the government, and you will in effect have permitted Barrera to have made himself at home here in mockery of our immigration law and policy. You will also have made it easy for any foreign dictator to deposit on our shores his country's undesirables and, by refusing to take them back, to force us to keep them and make them ours.

The government's contentions are not without force. The government has not proceeded maliciously or without reason in finding Barrera, a man who has already served time for state convictions of burglary and robbery in Florida, to be a potential danger to society. Fidel Castro's action in opening the Cuban jails to swell the flood of Mariel refugees shows that the scenario of a foreign dictator dumping criminals upon us is not a fantasy. The government, moreover, backs up its argument with one undisputed authority, *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), which found nothing unconstitutional in an excluded alien, who would not be taken back by his country of origin, being held at Ellis Island for over two years. A detainee's life in the 1950's on this small island in sight of the Statue of Liberty was regimented; he slept in a dormitory and spent the day in the great Passenger Hall.

*Ellis Island,* ed. Susan Jones (1989), 63. But he was free to read and write as he chose, *id.* and his companions were not felons. Not explicitly taking up whether confinement on Ellis Island was punishment, the Court simply found that the petitioner's "continued exclusion" did not deprive him "of any statutory or constitutional right." *Mezei,* 345 U.S. at 215, 73 S.Ct. at 630.

■ Detention, however, is permissible only if not "excessive in relation to the regulatory goal." *United States v. Salerno,* 481 U.S. 739, 747, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987). Excessive is what is disproportionate. What the government has lost sight of is the sense of proportion that must inform any governmental intrusion on liberty.

Barrera has been held in federal penitentiaries at Atlanta, Bastrop, Leavenworth, and Lompoc. Of these, Lompoc, Atlanta and Leavenworth are high security institutions, entailing the severest conditions for their inmates, while Bastrop is a medium security facility. Department of Justice, Federal Bureau of Prisons, *Federal Correctional Facilities,* 12, 13, 32, 35 (1991). Atlanta, Lompoc and Leavenworth are "United States Penitentiaries." Leavenworth, where Barrera presently resides, has a rated capacity of 951 and had a population of 1,597 in 1991. *Id.* at 32. The overcrowded prison features a massive wall with gun towers at each corner. Not the Bastille, it is a formidable fortress. The Bureau of Prisons, the administrator of all four facilities, describes them as "correctional" and their inhabitants as "offenders"; the administrator's announced aim is "a balance between punishment, deterrence, incapacitation, and rehabilitation." *Id.* at 3. No indication is given by the record here that the purpose of punishment is less vigorously pursued by the Bureau of Prisons when one of the inmates in its charge happens to be an excluded alien.

Since his incarceration began in 1985, Barrera has been outside of a federal prison for only six months in 1992. For over eight years he has been a federal prisoner in the fullest sense, a prisoner subject to all the deprivations inflicted by law on those found guilty of federal crimes, a prisoner now incarcerated in the most restrictive kind of institution in the federal penal system, his companions convicted felons.

Learned Hand, arguing for detention in *Mezei,* compared the excluded alien's plight to that of the Flying Dutchman. *United States ex rel. Mezei v. Shaughnessy,* 195 F.2d 964, 971 (2d Cir.1952) (dissent), *reversed,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). This operatic allusion is far from the realities of Barrera's imprisonment. He is not a passenger on a ship roaming the seas. He is immured within our country, a part of the general prison population of a high security prison. It is both the length and the conditions of confinement which Barrera has suffered that we address, not the length or conditions of confinement that characterized *Mezei.*

In sustaining statutes in the very few and limited situations in which preventive detention is permissible in the United States, the Supreme Court has stressed the crucial role of time. For example, in *Schall v. Martin,* 467 U.S. 253, 269, 104 S.Ct. 2403, 2412, 81 L.Ed.2d 207 (1984), Justice Rehnquist justified a provision of the New York Family Court Act authorizing pretrial detention of a juvenile, saying: "First of all, the detention is strictly limited in time." Similarly, in upholding preventive detention of arrestees charged with certain serious felonies under the Bail Reform Act, Chief Justice Rehnquist wrote: "The arrestee is entitled to a prompt detention hearing, . . ., and the maximum length of pretrial detention is limited by the stringent time limitations of the Speedy Trial Act." *United States v. Salerno,* 481 U.S. 739, 747, 107 S.Ct. 2095, 2101–2102, 95 L.Ed.2d 697 (1987).

In contrast, the government in this case insists that it has the power to hold Barrera in close physical confinement indefinitely. There is no time limit. The situation is most analogous to that presented by *Foucha v. Louisiana,* — U.S. —, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). There, too, a unit of government argued that it could hold a person indefinitely because he had "an antisocial personality that sometimes leads to aggressive conduct" and his disorder was one "for which there is no effective treatment." *Id.*

——, 112 S.Ct. at 1787. In short, the contention was that for an indefinite period preventive detention was both appropriate and constitutional because the purpose was not to punish but to guard the community against a probable danger for which there was no apparent remedy. The Court held confinement under this statutory scheme to violate substantive due process. *Id.*

*Garcia–Mir v. Meese,* 788 F.2d 1446 (11th Cir.), *cert. denied, Ferrer–Mazorra v. Meese,* 479 U.S. 889, 107 S.Ct. 289, 93 L.Ed.2d 263 (1986); and *Palma v. Verdeyen,* 676 F.2d 100 (4th Cir.1982) applied *Mezei* literally to the Mariels. These cases did not have *Foucha* for guidance. *Gisbert v. Attorney General,* 988 F.2d 1437, 1441 n. 6 (5th Cir.1993), *amended on other grounds,* 997 F.2d 1122 (5th Cir.1993), inadequately distinguishes it as involving a citizen in a psychiatric facility. *Foucha* established that while purpose is relevant in determining if detention is preventive, purity of purpose is not enough to exonerate governmental conduct that cuts excessively into liberty.

It is argued that the cases on pretrial detention and civil commitment do not have a generality that makes them applicable by analogy to confinement of an alien. On the contrary, Chief Justice Burger has written for a unanimous Supreme Court "that civil commitment *for any purpose* constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979) (emphasis supplied).

In determining whether Barrera is being subjected to punishment we must then turn to apply a standard of excessiveness that is objective. Is he being deprived by the government of a good to which any person is entitled and is the deprivation of such duration that it is excessive? Freedom to move outside a limited physical space, freedom to select one's companions, freedom to choose one's meals, freedom to attend to such studies or recreations as one likes, sexual freedom, freedom not to obey the directions of a warden—all of these goods are among those of which Barrera is denied by his confinement to a federal prison. The deprivation

has gone on for over eight years. It can no longer be fictionally characterized as exclusion from the country. It is imprisonment within the country. We need not draw the line exactly as to when attempted exclusion becomes imprisonment. Over eight years of prison are too many. Over eight years of such deprivations constitute punishment.

■ If we had to decide this case as one in which the validity of a statute was challenged as contrary to the Constitution of the United States, we would not hesitate to say that the Constitution had been violated. We do hesitate, however, to impute to Congress an intention to violate the Constitution. Consequently, we do not find in the ambiguous statutory scheme any authority to imprison Barrera indefinitely.

The government, to begin with, argues that the Attorney General is given implicit authority because once an alien has been determined excludable, the only way the alien may physically enter the United States is by parole granted by the Attorney General. *Mason v. Brooks,* 862 F.2d 190, 192 (9th Cir.1988). But of course this contention is not helpful. Physically Barrera has entered the United States. The question to be decided is under what conditions is he to stay in the United States. The question remains as to whether his excluded status may be converted into imprisonment for an unlimited duration by virtue of anything in the statute.

The government notes the statute does specify that an alien excluded under this Act "shall be immediately deported ... unless the Attorney General ... concludes that immediate deportation is not practicable or proper." 8 U.S.C. § 1227(a). The dissent takes this undisputed statutory right of the Attorney General to deport or postpone the deportation of an excluded alien, combines it with vague language from 8 U.S.C. § 1182(d)(5)(A) dealing with parole and § 1227(a)(1) dealing with the costs of detention, and determines that the statutory scheme gives the Attorney General the right to detain an alien indefinitely. A gap, however, exists between the statutory powers to deport, parole and detain and the power to imprison indefinitely. Congress has said nothing here about imprisoning in perpetuity.

Implicit in the statutory scheme is the power of the Attorney General to detain for a period. It is not unusual for a duration proper when limited in time to become improper and excessive when the confinement becomes excessive. See *Foucha v. Louisiana,* ―― U.S. at ――, 112 S.Ct. at 1784.

What Congress does say, it said in 1990 when it was aware of the Mariel Cubans and the problem that Castro's refusal to receive them created. It amended Title 8 to add § 1226(e) providing that the Attorney General shall take into custody any alien convicted of an aggravated felony and shall not release such a felon from custody unless the Attorney General determines that the alien cannot be deported because of the refusal of the country of origin to receive the alien. In that event the Attorney General is to parole the aggravated felon only pursuant to a review procedure which concludes that the alien will not pose a danger to the safety of other persons or property. Barrera is not an aggravated felon. The statute has no application to him. Congress found it necessary to enact such a clear provision for a much worse kind of case than his. This fact speaks strongly against the notion that somewhere implicit in the statutory scheme the Attorney General had the power all along to imprison indefinitely any felon she deemed to present a probable danger to the safety or property of others.

The government now makes the feeble contention that the purpose of the new law was to limit the Attorney General's discretion to parole. The opposite contention was made by the government in *Alvarez–Mendez v. Stock,* 941 F.2d 956 (9th Cir.1992), *cert. denied* ―― U.S. ――, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992), and found to be correct by the court; the new statute provided *authority* to detain. *Id.* at 962.

The government takes heart from our sustaining § 1226(e) against a much more limited constitutional attack in *Alvarez–Mendez.* Of course, we there gave the respectful attention a court may be expected to give to an explicit legislative enactment by Congress and we were dealing with a detention of three years when we stated that "detention is not an excessive means" for "[p]rotecting

society." *Id.* at 962. The analysis must be different where the question is whether any explicit congressional authorization for imprisonment lasting over eight years exists.

What the government is contending for in this case is an implicit statutory authorization on the part of one of the executive departments to imprison indefinitely any excluded alien the department cannot deport and the department deems to present a danger to society. On the mere issuance of a detainer by the INS, the excluded alien may be delivered to a federal warden and be locked up without limit of time; so the government contends. Its authority is absent.

The attempt is made to justify the government's action by focusing on the past of Barrera. It is not persuasive. Barrera was an Havana pickpocket awaiting trial when he became a Mariel refugee. He then committed the crimes for which he was punished in Florida. Since 1985 he has not been convicted of any state or federal crime. It is fanciful to suppose him more dangerous than any other ex-felon. It is dangerous to everyone's liberty to suppose that the government has a duty and a right to protect its citizens by the indefinite imprisonment of persons that the government *thinks* are dangerous. The government owes to those it governs the duty of protection. That duty is betrayed when the government uses illegitimate means to provide protection, when, for example, as here, the government imprisons a person it deems dangerous without charge, trial, or conviction. The infamous lettres de cachet of the King of France, a device for confining persons on the royal say-so, began as an extraordinary political measure and eventually became a routinized method of preserving order, employed in thousands of cases. Claude Quetel, *De Par Le Roy. Essai Sur Les Lettres De Cachet* (1981) 101; *Le Desordre Des Familles. Lettres de Cachet des Archives de la Bastille,* presented by Arlette Farge and Michel Foucault (1982) pp. 9–11. As was the case in France, the discretion exercised in imprisoning without trial is in the name of high authority but actually delegated to much lower employees of the government. Our government does limit this easy administrative method of confining per-

sons to one small segment of the population. Some evils are too great for any margin to be given them. The practice of administratively imprisoning persons indefinitely is not a process tolerable in use against any person in any corner of our country.

It is illegitimate to rely on a record of parole denials to prove unfitness for freedom when the basis of such denials is insufficient to justify punitive imprisonment. It is surprising to rely for justification upon an unproved and abandoned contention about a sexual assault allegedly made by the alien. It is absurd to analyze as a reward for Cuba the release from indefinite imprisonment of a stranger on our shores. It is sophistry to say incarceration for over eight years in penitentiaries is preventative, not punitive.

The suggestion is made that the extent of the government's obligation to an alien castaway is to provide food, clothing, and shelter—exactly what slaves were once furnished. Times have changed, and so has what a person—any person—has a right to expect from our government. Liberty from bodily confinement has been repeatedly recognized as "the core" of the liberty protected from arbitrary government action. *Foucha v. Louisiana*, —— U.S. ——, 112 S.Ct. at 1785, citing *Youngblood v. Romeo*, 457 U.S. 307, 316, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982).

The Attorney General's zeal for the protection of society is laudable. But all government officials present their actions as zealous for the welfare and protection of society. Even the royal letters de cachet consigning persons to the Bastille were normally executed with a virtuous sense of the danger being prevented by such expeditious means. In our society no person may be imprisoned for many years without prospect of termination. The rights of the human person must be vindicated as part of the common good of our society. Barrera has been punished too long without statutory warrant. The judgment of the district court issuing the Great Writ is **AFFIRMED.**

SNEED, Circuit Judge, dissenting:

The majority has given us an opinion from which we hear, in the distance, the clash of ideas and arms that characterized the Age of Enlightenment and the accompanying American and French Revolutions. However, I am not moved to conclude that the incarceration of Barrera–Echavarria has violated, or presently does violate, the Eighth Amendment of the Constitution. Moreover, this incarceration is explicitly authorized by an act of Congress. I begin by examining 8 U.S.C. § 1226(e).

I.

When Congress enacted section 1226(e) in 1990, it was aware of immigration detention and of the Attorney General's regulations for parole of Mariel Cubans. *See, e.g., Mariel Cuban Detainees: Events Preceding and Following the November 1987 Riots: Hearing Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary,* 100th Cong., 2d Sess. (1988) [hereinafter *Hearing I* ]. Thus, Congress was aware that the Attorney General was detaining some aliens and releasing others.

Its enactment of section 1226(e) was therefore designed *to prevent the release* of all such aliens. *See* 136 Cong.Rec. S17,118 (daily ed. Oct. 26, 1990) (statement of Sen. Graham): "[T]he Federal Government must make sure that dangerous aliens are not on the streets, not allowed to commit new crimes, and not caught in a lengthy deportation process." *See also id.* at S17,117 (referring to "the loopholes through which criminal aliens were escaping").

But which of the Mariel Cubans should be entitled to parole and which detained? Congress attempted, but failed, to pass a bill that would have limited the *detention* of excludable aliens to six months. *See* H.R. 4349, 100th Cong., 2d Sess. § 1 (1988). The bill's proponents specifically mentioned that their measure "would provide relief for Mariel Cuban detainees." *See Mariel Cuban Detainees: Hearing on H.R. 4330 and H.R. 4349 Before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary,* 100th Cong., 2d Sess. 1 (1988) [hereinafter *Hearing II* ] (introductory statement of Rep. Mazzoli).

Clearly, the majority in Congress saw that excessive parole, not excessive detention, was the problem. This should come as no surprise. Of the approximately 125,000 Mariel Cubans arriving in 1980, 122,000 were promptly paroled while an additional 800 were approved for parole by December 1981. *Palma v. Verdeyen,* 676 F.2d 100, 101 & n. 1 (4th Cir.1982); *see also Hearing I, supra,* at 20 (statement of Rep. Swindall): "[W]ith the exception of roughly 100 individuals, each and every [Mariel Cuban detainee] was, in fact, released into society and chose on their own volition to commit crimes, or to engage in activities that w[ere] expressly [prohibited] as a condition precedent to their being allowed to remain in this country."

The majority has turned the legislative history of section 1226(e) upside down. It treats that provision as an implicit limit on detention when in fact Congress regarded it as an explicit limit on parole. The Fifth Circuit agrees with the latter perspective, which the majority dismisses as "feeble," but which is actually the correct one. *See Gisbert v. U.S. Attorney General,* 988 F.2d 1437, 1445–46 (5th Cir.), *amended on other grounds,* 997 F.2d 1122 (5th Cir.1993). The enactment of section 1226(e) did not create a right to mandatory parole in all cases; it merely *limited* access to parole in instances of aggravated assault and otherwise left the law as it was.

It is curious that the majority argues that the explicit limits on parole in one part of section 1226(e) mandate parole in other contexts. The excluded middle, detention left to the discretion of the Attorney General, remains. Moreover, while Congress has set explicit limits on detention in other contexts, in this instance no limits are fixed. *See* 8 U.S.C. § 1252(c) (setting six-month limit on detention of deportable aliens).

The majority finally is driven to find an implicit limit to detention under section 1226(e) as well as in the current case. This dictum is gratuitous, dangerous—and incorrect. Section 1226(e) allows release *"only* after ... the [Attorney General's parole] review concludes that the alien will not pose a danger to the safety of other persons or to property." 8 U.S.C. § 1226(e)(3) (emphasis added). Section 1226(e) does not set any time limits and indeed goes to a great deal of trouble to preclude them.

## II.

### A.

The majority's decision mandating release of an *excluded alien* also rejects explicitly the overall statutory and regulatory structure of the immigration laws. That structure assumed reasonably that Congress contemplated that with respect to excluded aliens immediate deportation would be the normal response. *See* 8 U.S.C. § 1227(a)(1) (emphasis added): "Any alien ... who is excluded ... shall be immediately *deported ... unless the Attorney General,* in an individual case, in his discretion, *concludes that immediate deportation is not practicable or proper."*

Nevertheless, Congress recognized that *detention* is also a part of the statutory structure. The Attorney General has discretion to *parole* excludable aliens temporarily into the United States, but when such *parole* is complete, "the alien shall forthwith return or be returned *to the custody from which he was paroled."* 8 U.S.C. § 1182(d)(5)(A) (emphasis added). Further, the costs of maintaining an *excluded alien* "includ[e] detention expenses and expenses incident to detention of any such alien while he is being detained." *Id.* § 1227(a)(1). The statutes thus give the Attorney General three alternatives: *deportation, detention,* and *parole.* Congress, to repeat, has expressed a preference for the first, but generally has delegated the ultimate choice to the Attorney General.

### B.

The legislative history of the immigration acts is consistent with this view. Congress was certainly aware of immigration detention at the time it enacted the Immigration and Nationality Act of 1952. *See, e.g.,* 98 Cong. Rec. 4302 (1952) (statement of Rep. Walter) (recalling the story of Ellen Knauff, a "friendless little immigrant girl who sat on Ellis Island for nearly 3 years without anybody telling her why she was being detained"). More recently, Congress has been

aware of the plight of the Mariel Cubans. *See Hearing I, supra; Hearing II, supra.*

Notwithstanding its awareness of these issues, Congress *expressly* rejected an amendment to the immigration laws that would have allowed all excluded aliens to go free under bond. *See* S.Rep. No. 1515, 81st Cong., 2d Sess. 643–44 ("[T]o permit [excluded aliens] to enter the United States under bond would bring about the very thing that Congress intended should not be done."). And, as described above, the most recent congressional action was to *reduce* the Attorney General's discretion to *parole* excluded aliens, by *restricting the release of aggravated felons. See* 8 U.S.C. § 1226(e).

Nor can the mere length of detention, without more, guarantee an excluded alien's parole into the United States. To hold otherwise would reward the intractability of nations like Cuba who engage in thrusting their undesirables upon their enemies. The Constitution requires no such absurd result.

**C.**

Any lingering doubts about the Attorney General's statutory authority should be dispelled by 8 U.S.C. § 1103(a), which grants the Attorney General broad powers to enforce the immigration laws. This court has accordingly given deference to the Attorney General's interpretation of the immigration statutes. *See, e.g., Mason v. Brooks,* 862 F.2d 190, 192 (9th Cir.1988). The Attorney General's interpretation here predates *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). This interpretation has survived the *Mezei* decision and the 1990 congressional overhaul of the immigration laws.

**D.**

Detailed regulations set forth the procedures for parole of excluded aliens in general, 8 C.F.R. § 212.5, and of the Mariel Cubans in particular, *id.* §§ 212.12–212.13. Mariel Cuban detainees receive a parole review at least annually. 8 C.F.R. § 212.12(g)(2). The applicable regulations set forth detailed factors to guide the review panel's analysis. *See id.* § 212.12(d)(2)–(3). Panel

members review the detainee's file; should this be insufficient to grant parole, the panel must personally interview the detainee, who may be accompanied by a person of his choice. *Id.* § 212.12(d)(4)(i)–(ii). The panel's recommendations are then considered by the Associate Commissioner for Enforcement. *Id.* § 212.12(d)(4)(iii). Finally, detainees receive one additional review from a Justice Department panel. *Id.* § 212.13. Judicial review of these parole decisions is, of course, available to all detainees. *See Alvarez–Mendez v. Stock,* 941 F.2d 956, 963 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992).

**III.**

**A.**

There remains the question of the constitutionality of this statutory and regulatory structure as applied to Barrera–Echavarria. Again, a proper understanding of historical context is necessary.

Barrera–Echavarria arrived in the United States on May 29, 1980. Thereafter, he was arrested four times for various crimes: grand theft auto (May 28, 1981), retail theft (August 22, 1981), armed robbery (August 23, 1981), and strong arm robbery (June 4, 1982). The dispositions of these arrests are not revealed by the record. On July 11, 1982, petitioner was arrested for armed robbery. After his conviction in state court on March 1, 1983, he was sentenced to 230 days in prison, most of which he had served by the March 1 date.

No more than two months thereafter, May 26, 1983, Barrera–Echavarria was arrested for burglary and theft, and sentenced to two years in state prison. Less than two years later, January 29, 1985, the immigration authorities revoked petitioner's parole and assigned him to federal prison effective February 13, 1985. Thus, Barrera–Echavarria was not under direct control of the Immigration and Naturalization Service for almost five years following his arrival in this country. The loss of that status was attributable to his own misconduct while in this country for which he was punished by state authorities primarily.

The majority observes that "[s]ince 1985 [Barrera–Echavarria] has not been convicted

of any state or federal crime." Although literally true, this statement is misleading. Obviously, the purpose of federal detention was to prevent Barrera–Echavarria from committing such crimes. Nevertheless, while in prison, Barrera–Echavarria has been disciplined for numerous acts of misconduct: (1) In April 1985, Barrera–Echavarria received 15 days segregation for burning his pants; (2) again in April 1985, Barrera–Echavarria received 21 days segregation for burning a blanket; (3) in May 1985, Barrera–Echavarria received 30 days segregation for destroying a sink and toilet; and (4) in January 1986 and March 1987, Barrera–Echavarria fought with other inmates.

During his federal detention, he has received six parole reviews roughly on an annual basis. The last was in February, 1993. In 1992 he was paroled to a halfway house, but on June 8, 1992, he was arrested on charges of sexual assault and apparently detained by state authorities to May 28, 1993, when in due course he was transferred to the federal prison in Terre Haute, Indiana.

### B.

In light of this record, does continued incarceration of Barrera–Echavarria violate the Eighth Amendment? I think not. Petitioner, like his fellow Mariel Cubans, has received every opportunity to earn the parole he now claims as his right. This record embodies, at worst, a mixture of deserved punishment and protection of the public. In the sense of the Constitution, there is nothing "cruel and unusual" about it.

The basic compact between the government and its people is a simple and unchanging one: The state protects its people from enemies abroad and within, in exchange for the people's obedience to the law and allegiance. Each of the petitioner's constitutional rights must be read against that compact. In my opinion, the Attorney General's regulations, and the numerous opportunities this petitioner in particular has received, reflect a properly struck balance. As Justice Goldberg once said, "while the Constitution protects against invasions of individual rights, it is not a suicide pact." *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 160, 83 S.Ct. 554, 563, 9 L.Ed.2d 644 (1963).

By contrast, the majority frames the issue solely in terms of the petitioner's rights, inaccurately described. The rights of the public are treated as of substantially unequal and subordinate value. In that manner it finds "punishment" when in fact the sovereign has no interest in either subjecting the alien to retribution or to reform, but only in protecting the public during his uninvited and unwanted presence. This fatally flawed perspective allows the majority to distinguish the "one undisputed authority" applicable to this case, *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). In *Mezei*, the Supreme Court recognized the "present hardship" wrought by an excluded alien's detention on Ellis Island, *id.* at 216, 73 S.Ct. at 631, but ultimately concluded: "[W]e do not think that respondent's continued exclusion deprives him of any statutory or constitutional right." *Id.* at 215, 73 S.Ct. at 630. The majority here casts aside this clear command on the basis of an arbitrary and as-yet-undisclosed time limit. The majority applies instead the doctrines of *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (involving a person's right to avoid pretrial detention), and *Foucha v. Louisiana*, — U.S. ——, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (involving a person's right to be released from commitment upon recovering his sanity), while ignoring the vast and compelling legal distinction between the citizens in those cases and the excluded aliens in *Mezei* and this case.

Petitioner should, of course, continue his efforts to secure parole so as to ensure that he may again be paroled at the point where such parole would be reasonably safe for the community. The immigration officials should assume some risks in order to avoid crossing the line into retribution or reform. This court should stand ready to review the propriety of later parole decisions. But I cannot judicially impose a procrustean time limit on this process. I must, therefore, respectfully dissent.