Narciso CRUZ–ELIAS, Petitioner,

v.

UNITED STATES ATTORNEY GENERAL, Respondent.

Civ. A. No. 92–498–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 6, 1994.

Narciso Cruz–Elias, pro se.

Helen Fahey, U.S. Atty., Rebeca O. Hidalgo, Asst. U.S. Atty., Alexandria, VA, for respondent.

## MEMORANDUM OPINION

ELLIS, District Judge.

May the Attorney General indefinitely detain an excludable alien, who committed serious crimes within the United States while on immigration parole, but who has served his criminal sentence for those crimes, when there is no other country willing to accept him, and the Attorney General determines that he is unsuited for further immigration parole? This is the question presented by this petition for writ of *habeas corpus,* pursuant to 28 U.S.C. § 2241. Because petitioner's detention does not violate constitutional, statutory, or international law, the petition must be denied.

### I

Petitioner is one of approximately 125,000 Mariel Cubans, that is, Cuban citizens who arrived in the United States during the 1980 boatlift originating from the port of Mariel, Cuba. The United States declined to grant admission to many Mariel Cubans, but Cuba refused to accept their return. Most, including petitioner, were soon released into the United States on immigration parole. 8 U.S.C. § 1182(d)(5).[1] But, despite their physical entry into the country, they remained excludable aliens, regarded by legal fiction as detained at the border.[2]

The United States has actively sought to return some Mariel Cubans to Cuba, particularly those who returned to INS custody after committing crimes while on immigration parole within the United States. In December 1984, the United States and Cuba reached an agreement for the return of 2,746 named Mariel Cubans then in INS custody. In May 1985, Cuba suspended the agreement, after accepting return of only 201 of the listed persons. In November 1987, Cuba and the United States agreed to reimplement the 1984 agreement, the announcement of which provoked riots by Mariel Cubans incarcerated at the INS detention center at Oakdale, Louisiana, and the federal prison at Atlanta, Georgia. In the riots' wake, the United States Attorney General established new regulations on parole decisions for the Mariel Cubans. *See* 8 C.F.R. §§ 212.12, 212.13. This scheme for parole determinations and revocations remains in effect.

---

1. Such parole does not constitute admission to the United States. *See* 8 U.S.C. § 1182(d)(5)(A).

2. An "excludable alien" is one who is detained by immigration authorities prior to or when entering the United States. Even if the alien is permitted to enter the country, such as through immigration parole, he remains, in the law's eyes, at the border. *See Gisbert v. United States Attorney General,* 988 F.2d 1437, 1440, *amended,* 997 F.2d 1122 (5th Cir.1993) (describing this "entry fiction"). The United States may bring an exclusion proceeding to force the alien's departure. By contrast, a "deportable alien" is one who succeeds in gaining legal or illegal entry into the United States. It is well established that deportable aliens possess greater legal rights than excludable aliens. *See Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982).

While the United States is presently returning the 2,746 named Mariel Cubans under the 1984 agreement, it has reached no agreement with Cuba as to the return of other excluded Mariel Cubans.

Because petitioner was not in INS custody in 1984, he is not among those covered by the 1984 agreement. Beginning in 1985, petitioner was convicted of a number of crimes, including driving while intoxicated and assaulting his wife. Even so, he remained free on immigration parole. Then, in March 1988, a Pennsylvania court convicted him of forcefully raping a fourteen year old girl, and sentenced him to incarceration for four to ten years. In November 1990, the United States revoked petitioner's immigration parole, and Pennsylvania released him to an INS detainer. In June 1991, September 1992, and again in January 1994, petitioner was denied re-parole after consideration pursuant to the special parole review programs established for the Mariel Cubans. *See* 8 C.F.R. § 212.12.

Petitioner is presently in civil immigration detention at the federal prison at Petersburg, Virginia. He seeks *habeas* relief, alleging that indefinite detention of an excludable alien (i) is not authorized by statute, (ii) violates the Fifth and Sixth Amendments, and (iii) violates customary international law. The government contends that petitioner eventually might be repatriated if further negotiations with Cuba are successful, but that in any event, petitioner's detention is lawful even if repatriation is never possible.

Petitioner's claims, though not insubstantial, are ultimately unpersuasive.

## II

First, it is settled in this circuit that the Attorney General has implicit statutory authority to detain indefinitely an excludable alien. In 1982, the Fourth Circuit Court of Appeals held that, although no statute expressly authorizes such detention, Congress implicitly authorized it "when the alien cannot be returned and the Attorney General finds him unsuitable for parole." *See Palma v. Verdeyen,* 676 F.2d 100, 104 (4th Cir.1982). For the purposes of its decision, the *Palma* court specifically assumed that the United States was not negotiating with Cuba, and that repatriations would not soon take place. 676 F.2d at 102.

Since the *Palma* decision, Congress has not enacted a statute that clearly authorizes or forbids indefinite detention of excludable aliens. The statute that most nearly addresses the question, § 504(b) of the Immigration Act of 1990, provides that the Attorney General shall take custody of any alien convicted of an aggravated felony after his release from state or federal imprisonment, and shall not release him unless "review concludes that the alien will not pose a danger to the safety of other persons or property." 8 U.S.C. § 1226(e).[3] Several courts have persuasively established that this provision makes clear the Attorney General's authority to detain indefinitely an excludable alien who has committed an aggravated felony.[4] Petitioner's rape conviction appears to constitute an aggravated felony within the meaning of

---

3. *8 U.S.C. § 1226(e) provides that:*
   (1) Pending a determination of excludability, the Attorney General shall take into custody any alien convicted of an aggravated felony upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation and regardless of the rearrest or further confinement in respect of the same offense).
   (2) Notwithstanding any other provision of this section, the Attorney General shall not release such felon from custody unless the Attorney General determines that the alien may not be deported because the condition described in section 1253(g) [concerning countries delaying or denying acceptance of deportees] of this title exists.

   (3) If the determination described in paragraph (2) has been made, the Attorney General may release such alien only after—
      (A) a procedure for review of each request for relief under this subsection has been established,
      (B) such procedure includes consideration of the severity of the felony committed by the alien, and
      (C) the review concludes that the alien will not pose a danger to the safety of other persons or to property.

4. For numerous decisions finding explicit or implicit statutory authority for indefinite detention of excludable aliens, see *supra* note 9.

the immigration statutes.[5] In any event, whether or not 8 U.S.C. § 1226(e) applies to petitioner, it is clearly established by *Palma* in this circuit that the Attorney General has at least implicit authority to detain petitioner indefinitely.

### III

■ Petitioner's second argument, that indefinite detention of excludable aliens violates the Constitution, presents a more difficult question. While the Supreme Court has clearly stated that an excludable alien has no constitutional right to receive admission or immigration parole,[6] it is less clear that the Constitution has no application to an excludable alien's detention. The Supreme Court's most complete statement on such detention came in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). Mezei was a resident alien in the United States for twenty five years, but jour-

neyed to Eastern Europe in 1948. Upon returning to New York, Mezei, having travelled behind the Iron Curtain, was detained by immigration authorities. For undisclosed security reasons, the Attorney General, without a hearing, ordered Mezei's permanent exclusion. No other country would accept Mezei, and after nearly two years of detention on Ellis Island, he sought *habeas* relief. The Supreme Court held that Mezei's exclusion and detention did not violate federal statutes or the Constitution. *Id.* at 215, 73 S.Ct. at 630–31.

It is unclear whether the *Mezei* Court felt that the Constitution, though applicable, was not violated in the circumstances of the case, or whether the Court instead meant to hold that excludable aliens are outside the Constitution's mantle, possessing no constitutional rights with respect to their detention.[7] The latter view, though it presents substantial practical and conceptual problems,[8] has

5. The term "aggravated felony" includes "any crime of violence (as defined in section 16 of Title 18, not including a purely political offense) for which the term of imprisonment imposed (regardless of any suspension of such imprisonment) is at least 5 years." 8 U.S.C. § 1101(a)(43). Petitioner received a sentence of four to ten years imprisonment in Pennsylvania for rape. Such an indeterminate sentence is regarded as a sentence for the maximum possible period, subject to termination after the minimum period is served. *See United States v. Reyes–Castro*, 13 F.3d 377, 379–80 (10th Cir.1993) (finding defendant was convicted of aggravated felony, within 8 U.S.C. § 1101(a)(43)'s meaning, where defendant received indeterminate sentence "not to exceed five years"); *Commonwealth v. Daniel*, 430 Pa. 642, 243 A.2d 400, 403 (1968) ("[W]hether a sentence is stated in terms of minimum and maximum or is for a purely indeterminate term, the maximum sentence is the real sentence.").

6. *See Landon v. Plasencia*, 459 U.S. 21, 32–33, 103 S.Ct. 321, 329–30, 74 L.Ed.2d 21 (1982).

7. The Supreme Court in *Mezei* relied on its recent decision in *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950). There, the Court held that the Attorney General may exclude an alien without a hearing, for with regard to admission of aliens, "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Id.* at 544, 70 S.Ct. at 313. This passage arguably accepts that the Due Process Clause is applicable to excludable aliens, but then reduces the Clause to a tautology

in this context. Thus, dicta in *Mezei* and *Knauff* can be read to suggest that excludable aliens enjoy no constitutional protections, and many courts have done so. *See supra* note 9; *see also Kwong Hai Chew v. Colding*, 344 U.S. 590, 600, 73 S.Ct. 472, 479, 97 L.Ed. 576 (1953) ("'[E]xcludable' aliens ... are not within the protection of the Fifth Amendment.").

8. Justice Marshall summarized such problems in dissent in *Jean v. Nelson*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). There, the majority avoided the constitutional question whether the Fifth Amendment's equal protection guarantees extend to excludable aliens in detention, by finding that the current statutes and regulations provided non-discriminatory parole review. *Id.* at 854–55, 105 S.Ct. at 2996–97. Justice Marshall, in dissent, argued that the Court should have reached the constitutional question and resolved it in the aliens' favor. In his view, the idea that such detention need not comport with constitutional protections is irrational, since the Court has repeatedly held that excludable aliens possess constitutional rights. *Id.* at 868–77, 105 S.Ct. at 3004–09. For example, excludable aliens prosecuted for crimes must receive all constitutional protections as criminal defendants. *Wong Wing v. United States*, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896). An excludable alien may invoke the Fifth Amendment's Takings Clause to challenge an unlawful taking of property by the government. *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473 (1931). Further, Justice Marshall presumed (certainly correctly) that the Constitution would not permit the summary execution or mass starvation of excludable aliens. *Id.* 472

gained general acceptance in the courts.[9] Thus, under this view, the Constitution does not preclude the United States from imprisoning an excludable alien for a century, even though he has never committed a crime, if no other country will accept him.[10]

The majority of the Ninth Circuit panel challenged the consensus view recently in *Barrera–Echavarria v. Rison*, 21 F.3d 314, *rehearing en banc granted*, 35 F.3d 436 (9th Cir.1994).[11] The *Barrera* court held that, at some point, detention of an excludable alien becomes excessive in relation to the regulatory goal of excluding unwanted aliens, and constitutes punishment to which the Due Process clause is applicable. *Id.* at 316–17; *see Wong Wing v. United States*, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896) (excludable alien may not be punished prior to repatriation, by year of hard labor, without criminal trial and conviction).[12] The court

U.S. at 874, 105 S.Ct. at 3007. And finally, Justice Marshall noted that the Court has clearly recognized that all aliens within United States jurisdiction are "persons" within the Constitution's meaning. *Plyler v. Doe*, 457 U.S. 202, 210, 102 S.Ct. 2382, 2391, 72 L.Ed.2d 786 (1982). Given these conclusions, Justice Marshall recognized that "[t]he proper constitutional inquiry must concern the scope of the equal protection and due process rights at stake, and not whether the Due Process Clause can be invoked at all." *Jean*, 472 U.S. at 876–77, 105 S.Ct. at 3008.

The idea that excludable aliens' detention cannot violate the Constitution has also been assailed by a legion of academics. *See, e.g.*, Motomura, *Immigration Law After A Century of Plenary Power: Phantom Constitutional Norms and Statutory Interpretation*, 100 Yale L.J. 545 (1990); Scaperlanda, *Polishing the Tarnished Golden Door*, 1993 Wis.L.Rev. 965; Schuck, *The Transformation of Immigration Law*, 84 Colum.L.Rev. 1 (1984); Ethan A. Klingsberg, Note, *Penetrating the Entry Doctrine: Excludable Aliens' Constitutional Rights in Immigration Processes*, 98 Yale L.J. 639 (1989); Yukins, Note, *The Measure of a Nation: Granting Excludable Aliens Fundamental Protections of Due Process*, 73 Va.L.Rev. 1501 (1987).

9. *See Palma v. Verdeyen*, 676 F.2d 100, 103–04 (4th Cir.1982); *Gisbert v. United States Attorney General*, 988 F.2d 1437, 1441–43, *amended*, 997 F.2d 1122 (5th Cir.1993), *aff'g Ramos v. Thornburgh*, 761 F.Supp. 1258, 1260 (W.D.La.1991); *Alvarez–Mendez v. Stock*, 941 F.2d 956, 961–62 (9th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992), *aff'g* 746 F.Supp. 1006, 1014–15 (C.D.Cal.1990); *Amanullah v. Nelson*, 811 F.2d 1, 8–9 (1st Cir.1987); *Garcia–Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir.1985), *cert. denied*, 475 U.S. 1022, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986); *Fernandez–Roque v. Smith*, 734 F.2d 576, 582 (11th Cir.1984); *Jean v. Nelson*, 711 F.2d 1455, 1465–67 (11th Cir.1983), *aff'd on other grounds*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985); *Rodriguez v. Thornburgh*, 831 F.Supp. 810, 813–14 (D.Kan.1993); *In re Mariel Cuban Habeas Corpus Petitions*, 822 F.Supp. 192, 196 (M.D.Pa.1993); *Pena v. Thornburgh*, 770 F.Supp. 1153, 1159 (E.D.Tex.1991); *Tartabull v. Thornburgh*, 755 F.Supp. 145, 148 (E.D.La.1990); *Barrios v. Thornburgh*, 754 F.Supp. 1536, 1542 (W.D.Okla.

1990); *Sanchez v. Kindt*, 752 F.Supp. 1419, 1427–32 (S.D.Ind.1990).

10. This view is troublesome because it rests on the notion that the Fifth Amendment's due process and equal protection principles are inapplicable in the context of excludable aliens. In so doing, this view would arguably permit the obnoxious conclusion that the Constitution would tolerate a federal policy of excluding non-white aliens.

11. The Ninth Circuit panel's approach was taken earlier in *Rodriguez–Fernandez v. Wilkinson*, 654 F.2d 1382 (10th Cir.1981), where the Tenth Circuit found that indefinite detention of excludable Mariel Cubans constitutes punishment, and therefore is subject to Due Process limitations. *Id.* at 1387. Subsequent courts declined to follow *Rodriguez–Fernandez*'s course. *See supra* note 9.

Several more recent decisions have expressed some sympathy with the idea that due process has some role in this context. *See Paez–Herrera v. Karn*, Civ. No. 93–4009, 1993 WL 313641, at *1 (E.D.Pa. Aug. 11, 1993) (finding that, although claim of unconstitutional indefinite incarceration was troubling, petitioner had not exhausted administrative remedies); *Gaitan–Campanioni v. Thornburgh*, 777 F.Supp. 1355, 1359 (E.D.Tex. 1991) (allowing *habeas* petitioner, a detained Mariel Cuban, to conduct discovery upon finding "ample support" for his constitutional and statutory claims); *Saldina v. Thornburgh*, 775 F.Supp. 507, 512 (D.Conn.1991) (appointing counsel for Mariel Cubans seeking *habeas* relief, despite government's argument that constitutionality of their detention is settled question); *Consvegra v. Immigration and Naturalization Service*, No. 85–C–9357, 1986 WL 1865 (N.D.Ill.1986) (finding indefinitely detained alien has constitutional right to bail hearing pending exclusion hearing).

12. The *Barrera* court did not find the immigration statutes to be unconstitutional. Instead, after concluding that a statute authorizing indefinite detention would violate the Constitution, the court relied on the interpretive canon that an unconstitutional intention should not be unnecessarily imputed to Congress, and found that the ambiguous statutory scheme did not authorize the government's continued detention of Bar-

declined to draw a precise line distinguishing attempted exclusion from imprisonment, but found that, after eight years, Barrera–Echavarria's detention had crossed that line. *Id.* at 317.

■ While the *Barrera* court understandably rebels against the idea that excludable aliens inhabit a void beyond the Constitution's reach, its approach is flawed for two reasons. First, the *Barrera* approach rests far more on the concept of "punishment" than it will bear. The passage of time alone does not convert preventive detention of aliens to punishment. The Supreme Court, in distinguishing punishment from detention incidental to some other regulatory goal, has stated that the question is one of government intent, and principally turns on the rationality of the government's non-punitive purposes and the reasonableness of the detention in relation to those purposes. *See United States v. Salerno,* 481 U.S. 739, 747–48, 107 S.Ct. 2095, 2101–02, 95 L.Ed.2d 697 (1987) (pretrial detention under Bail Reform Act); *Schall v. Martin,* 467 U.S. 253, 268–69, 104 S.Ct. 2403, 2412, 81 L.Ed.2d 207 (1984) (pretrial detention of accused juvenile delinquents). Here, the primary reason for the detention is non-punitive, namely to prevent excludable aliens who have already committed crimes within this country from inflicting further harm. In other words, detention in these circumstances serves the purpose of protecting society from the risk of harm posed by certain excludable aliens. Given this, and given that the United States has no alternative to confining or releasing the alien, the detention does not become punishment solely by virtue of its duration.[13]

■ Second, the *Barrera* court's analysis is flawed because it gives no principle by which it can be determined when preventive detention becomes punishment, nor does it recognize any gradations of constitutional protection. Instead, it results in an "all or nothing" division, in which a detained excludable alien has no due process protection during the initial years of his confinement, and then, when the detention becomes punishment and the Constitution suddenly becomes relevant, the alien is entitled to be released unless convicted in a criminal trial. 21 F.3d at 315. The *Barrera* approach recognizes no middle ground where the alien's detention is subject to Due Process scrutiny, but the process that is due is not a full-scale criminal trial.

■ Under a more flexible due process analysis,[14] the government's vital interests in this area would certainly weigh heavily in determining what process should be accorded detained excludable aliens.[15] But an analysis to determine what process is due must also take account of an array of other factors, including the individuals' interests at stake, the efficacy of existing parole revocation and review procedures, the extent to which fair-

---

rera. 21 F.3d at 317. Barrera was not an "aggravated felon," and therefore 8 U.S.C. § 1226(e) was inapplicable to him. *Id.* at 318. The *Barrera* opinion implies that if § 1226(e) authorizes indefinite detention, as other courts have held, the statute is unconstitutional in some circumstances.

**13.** The situation would be very different of course, if the United States chose to imprison an excluded alien that another country was willing to admit. *See Wong Wing v. United States,* 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896) (finding aliens punished when subjected to one year imprisonment at hard labor prior to deportation). In that situation, the United States' confinement of the alien could not be explained as a measure necessary to keep the alien out of this country.

**14.** The foundations for such a due process analysis are already in place. The Supreme Court has clearly recognized that excludable aliens are, as persons within our jurisdiction, protected by the Fifth Amendment. *See Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). In various decisions, the Supreme Court has also recognized that "civil detention for any purpose constitutes a significant deprivation of liberty." *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979) (indefinite civil commitment of mentally ill); *see also Foucha v. Louisiana,* 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (commitment of persons found not guilty by reason of insanity).

**15.** The government's interests are as varied as they are significant. These interests include controlling admission to this country, preventing harm to its citizens, and discouraging other nations from sending unwanted persons to the United States and refusing to accept their return.

698

ness would be enhanced by further procedures, the alternatives available to imprisonment, the likelihood of future repatriation, the hardship imposed by the detention, as well as the duration of the confinement.

■ In any event, it is unnecessary to define the precise contours of such an analysis, for whatever protections the Due Process Clause affords to excludable aliens, it is not violated here. Petitioner has been in INS custody for four years. While released on immigration parole, he committed serious and violent crimes. Because no nation, Cuba or otherwise, will accept him, the Attorney General has no choice but to detain or release him into the United States.

Such release has been considered, for pursuant to the special parole program for Mariel Cubans, petitioner's case has been reviewed several times by Cuban Review Panels consisting of members selected from the professional staff of the INS. *See* 8 C.F.R. § 212.12(d)(1). Such reviews must occur annually. *Id.* at § 212.12(g)(2). Each review begins with a reevaluation of the detainee's file. *Id.* at § 212.12(d)(4)(i). If parole is not recommended on the basis of that review, the detainee is personally interviewed by the panel. *Id.* at § 212.12(d)(4)(ii). The detainee is permitted to present any relevant oral or written information, and to have another person of his choice present to assist in answering questions. *Id.* The Cuban Review Panel may recommend parole if a majority of its members find that petitioner is presently nonviolent, likely to remain nonviolent, not likely to pose a threat to the community, and not likely to violate his parole conditions. *Id.*

16. The regulations also establish a Departmental Release Review Program, pursuant to which panels comprised of Department of Justice officials review parole denials by the INS. *See* 8 C.F.R. § 212.13. Each excludable Mariel Cuban who was detained by the INS as of the effective date of the regulations is entitled to one such review. *Id.* at § 212.13(b). This portion of the regulations is not applicable to petitioner, who was not in custody on its effective date, December 11, 1987. *See* Repatriation Review of Mariel Cubans, 52 Fed.Reg. 48884 (Dec. 28, 1987).

17. As it happens, it is, strictly speaking, unnecessary here to reach and decide the question whether the Constitution's mantle extends to protect excludable aliens, for even assuming, *arguen-*

at § 212.12(d)(2). The regulations contain a list of factors to be weighed in the decision, including the detainee's criminal and mental history, institutional progress, ties to this country, and likelihood of compliance with parole conditions. *Id.* at § 212.12(d)(3). Following its deliberations, the panel must issue a written recommendation, to parole or detain, that is reviewed by the INS's Associate Commissioner for Enforcement. *Id.* at § 212.12(d)(4)(iii). The Associate Commissioner must also set forth in writing the reasons for continued detention, if parole is denied. *Id.* at § 212.12(b)(1).[16]

This case, therefore, is not the nightmarish scenario that is possible if, as most courts have ruled, the Constitution has no bearing on excludable aliens' detention. This is not a case in which an excluded alien, having committed no wrong other than arriving in the United States without its permission, faces the possibility of serving a de facto life sentence in an American prison because neither the United States nor another country wishes to accept him. Instead, petitioner has been detained, after committing serious criminal offenses, for four years pursuant to an administrative program that offers regular review, clear and definite standards, and apparently fair procedures. Whatever process is due an excludable alien detained by the United States under a proper Due Process analysis,[17] it has surely been provided to this petitioner.

## IV

■ Finally, as to petitioner's third argument, international law does not require peti-

*do,* that it does, petitioner has received all the process he is due. Still, the Court notes that sound logic and policy compel the conclusion that excludable aliens are entitled to the some constitutional protections, including Due Process. Surely the Constitution imposes some limits on the government's treatment of excludable aliens. *See supra* note 8. And the application of the Due Process Clause in the excludable alien context must be viewed, not just as conferring rights on certain aliens, but equally importantly, as limiting the exercise of governmental power. Of course, the application of these constitutional provisions, and therefore the definition of the required standards of government behavior, must take account of excludable aliens' peculiar status.

tioner's release. Public international law controls only "when there is no treaty and no controlling executive or legislative act or judicial decision." *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900); *Gisbert v. United States Attorney General,* 988 F.2d 1437, 1447–48, *amended,* 997 F.2d 1122 (5th Cir.1993); *Garcia–Mir v. Smith,* 766 F.2d 1478, 1453 (11th Cir.1985), *cert. denied,* 475 U.S. 1022, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986). As noted, the question posed by petitioner is answered by federal statutes, administrative regulations, and judicial precedents.

Even if international law were relevant here, it would not support petitioner. He contends that international law and custom forbid "unreasonable confinement or prolonged arbitrary detention." While this general principle may validly apply in some circumstances, it has no application here. Petitioner was granted immigration parole shortly after his arrival to the United States. The United States revoked petitioner's parole only after he violated the conditions of that parole by committing a number of serious crimes, including the rape of a minor female. Under these circumstances, petitioner's continuing detention is neither unreasonable nor arbitrary.

In sum, because petitioner's detention is authorized by federal statute and violates neither constitutional nor international law, his petition for *habeas* relief must be denied.